IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

LAURA DURR,                               )      Case No. 1:18-CV-2876
                                          )
        Plaintiff,                        )
                                          )
        v.                                )      MAGISTRATE JUDGE
                                          )      THOMAS M. PARKER
                                          )
COMMISSIONER OF SOCIAL SECURITY,          )
                                          )      **MEMORANDUM OF OPINION**
        Defendant.                        )      **AND ORDER**
                                          )

## I.      Introduction

Plaintiff, Laura Durr, seeks judicial review of the final decision of the Commissioner of

Social Security, denying her application for disability insurance benefits ("DIB") under Title II

of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. § 405(g) and the

parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF

Doc. 11.  Because the ALJ failed to apply proper legal standards in evaluating one of her treating

physician's opinions, the Commissioner's final decision denying Durr's application for DIB

must be VACATED and Durr's case must be REMANDED for further consideration consistent

with this Memorandum of Opinion and Order.

## II.     Procedural History

On November 3, 2015, Durr applied for DIB.  (Tr. 198-199).[1]  Durr alleged that she

became disabled on November 11, 2014.  (Tr. 198).  Durr's last insured date will be December

---

[1] The administrative transcript is in ECF Doc. 10.

31, 2019.  (Tr. 200).  The Social Security Administration denied Durr's application initially and upon reconsideration.  (Tr. 95-98, 102-108).  Durr requested an administrative hearing.  (Tr. 109).  ALJ Keith J. Kearney heard Durr's case on February 21, 2018, and denied the claim in a May 24, 2018 decision.  (Tr. 10-21).  On October 18, 2018, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).  On December 14, 2018, Durr filed a complaint seeking judicial review of the Commissioner's decision.  ECF Doc. 1.

## III.   Evidence

### A.   Relevant Medical Evidence

Durr completed a function report on November 12, 2015.[2]  (Tr. 241-248).  She reported suffering from peripheral neuropathy pain that kept her awake at night.  She reported no longer being able to multi-task or work quickly enough to perform her past work.  (Tr. 241).  She reported that she used to cry at her desk because she felt overwhelmed.  (Tr. 273).  She had difficulty focusing due to pain and lack of sleep.  She had trouble sitting for any length of time and struggled with depression.  (Tr. 241).  Her problems affected her ability to lift, stand, sit, kneel, climb stairs, her memory, her ability to complete tasks, and her concentration.  (Tr. 246).

In the fall of 2014, Durr had uncontrolled blood sugar and neuropathy.  However, she did not feel comfortable with insulin therapy and wanted to try making lifestyle changes.  (Tr. 313-314).

A nerve conduction study completed in April 2015 returned findings "mostly consistent with bilateral generalized distal to mild to moderate sensory motor peripheral polyneuropathy of the bilateral distal lower extremities."  The test also showed "bilateral mild to moderate sensory

---

[2] Durr's husband also completed a function report, but Durr cites a form that appears to be a duplicate of her own form.  ECF Doc. 12 at 23.  (Tr. 267-274).  Her husband's report is at 15E.  (Tr. 298-305).

motor axonal as well as demyelinating neuropathic denervating features bilaterally." There was no evidence of lumbosacral radiculopathy. (Tr. 369).

Durr began treating at the Cleveland Clinic in October 2016. During her October 26, 2016 examination with Dr. Ann Kelleher, Durr requested a referral to functional medicine for her diabetes. (Tr. 427). Durr reported that she was not seeing a doctor for her diabetes, was not taking insulin, was not exercising, and had tried several diets to help with weight loss. Dr. Kelleher diagnosed type 2 diabetes mellitus without complication and without long-term current use of insulin. (Tr. 429).

On January 17, 2017, Durr saw Dr. Seema Patel for her diabetes and peripheral neuropathy. (Tr. 432). Physical examination revealed back pain, numbness or tingling of her feet, anxiety, depression and sleep difficulties. (Tr. 434). But Durr had no abnormalities in her arms or legs. Her gait was normal and her treatment plan – simply to manage her diet and stress – was conservative. (Tr. 434-435). Dr. Patel diagnosed peripheral neuropathy, type 2 diabetes mellitus without complication, mixed hyperlipidemia, and recurrent major depression in partial remission. (Tr. 445). On February 21, 2017, Durr's diagnoses were listed as: type 2 diabetes mellitus with diabetic neuropathy, without long-term current use of insulin; chronic pain in left foot; chronic pain in right foot; obesity; and mixed hyperlipidemia. (Tr. 466).

On February 21, 2017, Mladen Golubic, MD,[3] examined Durr at Dr. Patel's request. Durr reported losing 27 pounds through diet. (Tr. 463). Durr was encouraged to get her blood tests done and was advised that medication might be necessary to control her blood sugar levels in the future. (Tr. 466).

---

[3] Durr refers to Dr. Golubic using feminine pronouns. (ECF Doc. 12 at 8). The ALJ and the Commissioner use masculine pronouns to describe Dr. Golubic. ECF Doc. 14 at 5. Dr. Golubic is male: *see* Mladen Golubic, M.D., PhD. (last visited 10/11/19).

On March 8, 2017, Durr saw Beth Bluestone, R.D., for nutrition counseling at the Centers for Lifestyle Medicine. Bluestone provided a nutrition plan. (Tr. 471).

On March 23, 2017, Durr saw Josie Znidarsic, DO, for her history of chronic pain and difficulty controlling symptoms. (Tr. 475). She reported chronic pain and related issues of anxiety and depression. (Tr. 476). Durr underwent acupuncture and received instruction on stress reduction, pain reduction and positive behavioral changes. (Tr. 476).

On March 30, 2017, Durr saw Sandra Darling, DO for her history of chronic pain. She reported no change after acupuncture but underwent acupuncture again that day. (Tr. 486-487). Durr saw Dr. Darling again on April 6, 2017. She reported pain in both feet and calves. She reported that her pain was causing her stress and that she was managing her stress through prayer and meditation. (Tr. 494). On April 13, 2017, Durr reported working on dietary changes. She had lost 90 pounds and was taking little walk/runs down the block and back. She was still complaining of pain in her feet and lower extremities. (Tr. 499). On April 20, 2017, Durr told Dr. Darling that the pain depressed her. (Tr. 504). On May 4, 2017, Durr reported pain in her feet. She was practicing positive thinking, gratitude, meditation, and foot massage with natural oil. Positive thoughts were helping with her depression. (Tr. 521).

Durr attended a group meeting on May 8, 2017. She reported moving more and meditating every day. She had done a little yoga and attended Zumba classes. She reported that her fasting blood sugar was over 300 on some days. Because the high blood sugar levels depressed her, she stopped measuring them. (Tr. 526). On May 11, 2017, she continued to report pain in her feet and legs, which was worse at night. She continued to refuse to take medication for her pain. (Tr. 532). She was moving more and drinking organic coffee. (Tr. 531). Her physical examination was normal. (Tr. 533).

On June 7, 2017, Durr met with a neurologist, Dr. Robert Kosmides. (Tr. 555-561). Dr. Kosmides diagnosed small fiber neuropathy (Tr. 559) and listed her prior diagnoses as peripheral neuropathy, type 2 diabetes mellitus without complication, mixed hyperlipidemia, recurrent depression in partial remission, obesity, pain in both feet, pain in both lower legs, type 2 diabetes uncontrolled with neuropathy, pure hypercholesterolemia, and chronic pain syndrome. (Tr. 560).

Durr saw Dr. Andrew Bang at the Cleveland Clinic on October 26, 2017. (Tr. 594-599). Dr. Bang reported a generalized decrease in hands and feet sensation along no specific dermatome but related to neuropathy from her diabetes. (Tr. 596). He diagnosed chronic left-side low back pain without sciatica, segmental dysfunction of the lumbar region and segmental dysfunction of the cervical region. (Tr. 596).

On August 3, 2017, Durr reported to Dr. Golubic that she had ongoing pain in her ankles and feet, but it was "better." Durr's fasting blood glucose level had dropped significantly and she was taking frequent walks in the zoo. (Tr. 574). In September 2017, Durr's diabetes treatment consisted of solely diet and exercise. Durr was walking almost every day, doing squats and carrying around her 10-month-old grandson. (Tr. 587).

Durr complained of back and neck pain and had mild to moderate pain with range of motion in her spine and positive straight leg raises on October 27, 2017. Her gait was normal, and she had normal strength in her arms and legs. She was able to heel to toe walk. (Tr. 596).

**B.    Relevant Opinion Evidence**

**1.    Treating Physician – Dr. Buckner[4] – December 2014**

---

[4] The gender of Dr. Buckner is also not clear from the parties' briefs. Durr refers to Buckner as a "he" (ECF Doc. 12 at 17) and the ALJ refers to Dr. Buckner as a "she." (Tr. 19-20). Dr. Kelli Suzanne Buckner is a female (last visited 10/11/19). She now is affiliated with Bowtie Medical, LLC (*Id.*); when she saw Durr, Dr. Buckner was affiliated with Tenpenny Integrative Medical Center. (Tr. 311).

On December 12, 2014, Dr. Buckner completed a form requested by Cigna Life Insurance regarding a short-term disability claim submitted by Durr.  (Tr. 320).  Dr. Buckner stated that she had last seen Durr on August 22, 2014, before her alleged disability began.  (Tr. 320).  Dr. Buckner listed Durr's primary diagnosis as diabetes mellitus, type 2, with neurologic complications.  The factors impacting Durr's return to work were listed as neuropathy, insomnia due to neuropathic pain and uncontrolled blood sugars.  Dr. Buckner opined that Durr could not return to work at that time because she required full-time commitment to her nutritional and exercise program.  (Tr. 320).

On December 16, 2014, Dr. Buckner's nurse case manager, Kristin A., completed a second form for Cigna Life Insurance.  (Tr. 316-317).  Ms. A. stated that Durr was having difficulty sleeping due to neuropathic pain and had decreased mental clarity due to lack of sleep and hyperglycemia.  This assessment was based on Durr's subjective reports.  (Tr. 316).  Ms. A. stated that Durr was on a strict nutritional program and could possibly return to work in three months without restrictions if she was showing improvement.  (Tr. 317).

### 2.  Treating Physician – Mladen Golubic, M.D., Ph.D. – September 2017

Dr. Mladen Golubic completed a physical medical source statement on September 20, 2017.  (Tr. 582-585).  Dr. Golubic diagnosed Durr with type 2 diabetes, uncontrolled with neuropathy, pure hypercholesterolemia, obesity, and depression in partial remission.  Dr. Golubic listed Durr's symptoms as: "pain in both feet and ankles, constant ache in quality, burning at times, plus numbness at the bottom of feet, "electrical" on and off, on average 8/10 intensity."  Durr's treatment was described as "intensive and comprehensive lifestyle intervention."  (Tr. 582).

Dr. Golubic opined that Durr's condition would last at least twelve months and that emotional factors contributed to the severity of her symptoms and functional limitations. (Tr. 582). He further opined that Durr could walk for thirty to sixty minutes four times a week and sit one hour at a time. During a typical work day, she could stand/walk less than two hours and sit at least six hours with the ability to shift positions at will. He opined that, due to pain/parasthesias and numbness, Durr would need to walk every hour for at least two to five minutes. (Tr. 583) Dr. Golubic opined that Durr could occasionally lift 10 pounds and could occasionally twist, stoop and climb stairs; she could rarely crouch or squat; and could never climb ladders. (Tr. 584). Dr. Golubic indicated that he was "not sure" but thought that Durr would be absent from work about two days per month. (Tr. 585).

### 3.    Treating Chiropractor – Michael Urbanc, D.C., – May 2015

Durr's treating chiropractor, Michael Urbanc, D.C., completed a form for Cigna on May 11, 2015. (Tr. 366). He diagnosed Durr with degenerative disc disease, sciatica, myalgia, pain in pelvis, hip and thigh, lumbago, and peripheral artery disease. He reported that she had difficulty walking or standing for any period due to her lower back pain and numbness in both lower extremities. He also reported that she had difficulty sitting and rising and straightening after sitting for extended periods. (Tr. 366).

### 4.    Consultative Psychologist – Amber L. Hill, Ph.D., – December 9, 2015

At the request of the state agency, Amber L. Hill, Ph.D., examined Durr for a psychological evaluation in December 2015. (Tr. 339-347). Durr's chief complaint was that she had peripheral neuropathy in her feet. Durr reported that she had worked until November 2014 when she reported having "too many complications with neuropathy." As a result of her

significant pain, she had difficulty completing her job duties. Due to her pain, she reported having difficulty concentrating.

Dr. Hill declined to diagnose any mental impairments. (Tr. 344). She noted that Durr did not report any symptoms that would suggest the need for ongoing treatment and that Durr's "description of her depressive symptomatology does not appear to be clinically significant." (Tr. 344-345). Dr. Hill opined that Durr had no limitations in her ability to understand, remember and carry out instructions; maintain attention, concentration, persistence or pace; in her ability to respond appropriately to supervisors or co-workers in a work setting; or in responding appropriately to workplace pressures. (Tr. 345-346).

### 5. Consultative Examiner – Robin Benis, M.D. – January 2016

Robin Benis, M.D., examined Durr on January 19, 2016. (Tr. 415). Dr. Benis diagnosed diabetes, peripheral neuropathy, chronic low back pain and depression and anxiety. (Tr. 418). An x-ray of Durr's spine showed mild to moderate spondylosis and mild degenerative arthrosis of the lower lumbar facet joints. (Tr. 419). Dr. Benis noted that Durr had a normal gait, with normal stance and no need for an assistive device. She walked heel to toe without difficulty, performed a full squat, needed no help getting on or off the exam table, had full musculoskeletal range of motion, intact sensation in her arms and legs, negative straight leg raises, and normal joints and reflexes. (Tr. 416-418). Dr. Benis opined that Durr had mild limitations with standing for long periods of time, going up and down stairs, and walking long distances due to her low back pain. (Tr. 418).

### 6. State Agency Reviewing Physicians

In December 2015, state agency reviewing psychologist, Karla Voyten, Ph.D., opined that Durr did not have any severe mental impairments. (Tr. 75). Juliet Savitscus, Ph.D., affirmed Dr. Voyten's opinion on May 29, 2016. (Tr. 88).

On January 27, 2016, state agency reviewing physician, William Bolz, M.D., opined that Durr was limited to work at the light exertional level. (Tr. 77-78). On June 1, 2016, Robert Wysokinski, M.D., reviewed Durr's records and generally agreed with the opinions of Dr. Bolz. (Tr. 90-92).

### 7. Letter from Durr's Work Manager – April 2015

On April 2, 2015, Matthew Santa, an Assistant Vice President of New York Community Bancorp, Inc. and Durr's manager for several years, wrote a letter stating that Durr had complained at work that she was not sleeping and was exhausted. He saw that she struggled with mental anguish and was unable to keep up with her time constraints. He supported her suggestion that she should take leave. (Tr. 218).

### 8. Russ Durr's Function Report – September 2017

Durr's husband, Russ Durr, completed a function report on September 12, 2017. (Tr. 298-305). He reported that he and Durr spent the day together cooking, talking, watching movies and, sometimes, walking. He reported that Durr had pain in her feet and legs that interfered with her sleep and affected her during the day. (Tr. 298). However, he reported that she was able to pay attention and follow instructions very well. (Tr. 303).

### C. Relevant Testimonial Evidence

Durr testified at the administrative hearing. (Tr. 41-56). She was 5'6" and weighed 205 pounds. She lived with her husband who received disability for a degenerated disc in his back.

(Tr. 53).  She had a 32-year-old daughter and a grandson who came to visit her often.  She had babysat her one-year-old grandson a few times.  (Tr. 54).

Durr had last worked as a banking consultant at a call center.  (Tr. 42).  She sat most of the day for that job and did not have to lift anything.  She left the job because she was having trouble focusing.  (Tr. 43).  The  job involved solving problems for customers who called the bank.  There were productivity requirements at her prior job.  (Tr. 52).  She gave her notice and stopped working in November 2014.  (Tr. 44).  Before that job, she had worked in a call center for a mortgage loan company, another job that required mostly sitting and talking on the phone. (Tr. 44).

Durr stated that she was unable to work because she didn't sleep at night due to pain. (Tr. 41).  She stated she had trouble concentrating.  (Tr. 42).  Her pain when working was primarily in her feet.  (Tr. 49).  She had to leave work a couple of times due to pain and had missed work because she was tired.  (Tr. 49-50).

Durr had "nervous breakdowns" when she was 16 and 18.  She also believed that she had post-partum depression but had not received any treatment for that.  In fact, she had not received any mental health treatment since she was younger.  She felt depressed and overwhelmed every day but did not seek treatment.  She believed in a holistic approach: she took supplements, exercised and received support from her family. (Tr. 45-46).  She did not take any prescription drugs.  (Tr. 55).  She had tried acupuncture for pain and had received chiropractic adjustments for a misalignment of her back.  (Tr. 47).

On a good day, she could walk up to a half hour.  She frequently walked at the zoo.  (Tr. 48).  She also spent time online, watching TV and reading.  (Tr. 55-56).  She had four cats.  (Tr. 56).

Vocational Expert ("VE") Jacquelyn Schabacker also testified during the hearing. (Tr. 57-62). The VE found that Durr's past work was as a customer service representative and as a telephone sales representative, both sedentary jobs. (Tr. 58). The ALJ directed the VE to consider a hypothetical individual with Durr's same past work experience and to assume that she was limited to light work, but could occasionally use ramps and stairs, but could never use ladders, ropes or scaffolds; she could occasionally balance, kneel, stoop, crouch and crawl; she must avoid hazards such as heights and machinery, but could endure ordinary hazards, such as boxes on the floor, doors ajar, approaching people, or vehicles; and she must avoid concentrated exposure to extreme heat, extreme cold and/or vibrations. (Tr. 58-59). The VE opined that this individual could perform Durr's past work and stated that her opinion was consistent with the *Dictionary of Occupational Titles* ("DOT"). (Tr. 59).

Next, the ALJ asked the VE whether the hypothetical individual would be able to perform Durr's past jobs if she had the additional limitation only frequent bilateral handling and fingering. (Tr. 59). The VE testified that the customer service representative position would still be available according to the DOT, but not as Durr had performed that job. (Tr. 60). If the hypothetical individual was additionally limited to jobs involving only simple, routine and repetitive tasks, she would be unable to perform either of Durr's past jobs. (Tr. 60). If the individual was required to work at a production rate pace, she could not perform Durr's past jobs. (Tr. 61-62). Nor would she be able to perform Durr's past jobs if she was off task 20% of any given workday. (Tr. 60-61).

## IV.    The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

3. Durr had the severe impairments of obesity, diabetes without complication without the long-term use of insulin, and idiopathic peripheral neuropathy. (Tr. 12).

5. Durr had the residual functional capacity to perform light work, except she could occasionally climb ramps and stairs; could never climb ladders, ropes or scaffolds; could occasionally balance, stoop or crouch; could never kneel or crawl; she could not be exposed to hazards such as heights or machinery, but was able to safely avoid ordinary hazards in the workplace (such as boxes on the floor, doors ajar or approaching people and vehicles); she must avoid concentrated exposure to extreme heat and cold; she must avoid concentrated exposure to vibration; and she could only frequently engage in bilateral fingering or handling. (Tr. 15).

6. Durr was capable of performing her past relevant work as a customer service representative and telephone sales representative. (Tr. 20).

Based on all his findings, the ALJ determined that Durr was not under a disability from November 11, 2014, the alleged onset date, through the date of the ALJ's decision. (Tr. 20).

## V.    Law & Analysis

### A.    Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard, the court does not decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). If supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court would reach a different conclusion or evidence could have supported a different conclusion. 42 U.S.C. §§ 405(g); *see also Elam*, 348

F.3d at 125 ("The decision must be affirmed if . . . supported by substantial evidence, even if that evidence could support a contrary decision."); *Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record.").  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if supported by substantial evidence, however, the court will not uphold the Commissioner's decision when the Commissioner failed to apply proper legal standards, unless the error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp.2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10-CV-017, -2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform his past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B.    Treating Physician Rule[5]

#### 1.    Dr. Golubic

Durr argues that the ALJ erred in assigning less than controlling weight to the opinion of Dr. Golubic, her treating physician, and great weight to the state agency reviewing physicians. At Step Four, an ALJ must weigh every medical opinion that the Social Security Administration receives. 20 C.F.R. §§ 404.1527(c), 416.927(c). An ALJ must give a treating physician's opinion controlling weight, unless the ALJ articulates good reasons for discrediting that opinion. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). "Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Id.* (quoting 20 C.F.R. § 404.1527(c)(2)). Good reasons for rejecting a treating physician's opinion may include

---

[5] 20 C.F.R. §§ 404.1527(c) and 416.927(c) apply because Durr filed her claim before March 27, 2017.

that: "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *See Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (quotation omitted); 20 C.F.R. §§ 404.1527(c), 416.927(c). Inconsistency with nontreating or nonexamining physicians' opinions alone is not a good reason for rejecting a treating physician's opinion. *See Gayheart*, 710 F.3d at 377 (stating that the treating physician rule would have no practical force if nontreating or nonexamining physicians' opinions were sufficient to reject a treating physician's opinion).

If an ALJ does not give a treating physician's opinion controlling weight, he must determine the weight it is due by considering the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. *See Gayheart*, 710 F.3d at 376; 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). Nothing in the regulations requires the ALJ to explain how he considered each of the factors. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). Nevertheless, the ALJ must provide an explanation "sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376; *see also Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight he actually assigned."). When the ALJ fails to adequately explain the weight given to a treating physician's opinion, or otherwise fails to provide good reasons for rejecting a treating physician's opinion, remand is appropriate. *Cole*, 661 F.3d at 939.

Dr. Golubic opined that Durr would need to walk around every hour for two to five minutes and was "not sure" but opined that she would miss about two days of work per month. (Tr. 582-584). Regarding Dr. Golubic's opinion, the ALJ stated:

> The undersigned accords partial weight to the opinion of Mladen Golubic, M.D., Ph.D., (Ex. 6F). On September 20, 2017, Dr. Golubic authored a medical source statement, in which he stated that the claimant's impairments limited her ability to sit, stand, walk, lift, carry, and engage in postural activities. He also opined that the claimant would be off-task 10% of the workday, she was only capable of low stress work, and he stated that he was not sure, but that she might miss about two days of work per month due to her impairments. Dr. Golubic is an acceptable medical source with a treating relationship with the claimant, and the record does partially support some of the limitations he imposed. However, his opinion is not given controlling weight because it is not entirely consistent with other substantial evidence in the record that indicates the claimant's limitations are not as severe, his opinion was somewhat vague, he had a short treating relationship with the claimant, and his opinion also concerns the claimant's ability to work, which is an issue reserved to the Commissioner. (20 CFR 404.1527(d)). Therefore, his opinion is given partial weight overall.

(Tr. 19). If an ALJ does not assign controlling weight to a treating physician's opinion, he is required to provide an explanation "sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376; *see also Cole* 661 F.3d at 938. In this case, the ALJ failed to provide sufficiently specific reasons for his decision to discount Dr. Golubic's opinion.

The ALJ recited some of the factors he was required to consider pursuant to 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). However, he did not cite or discuss any specific facts in a way that would show that he actually considered these factors. For example, the ALJ found that Dr. Golubic's opinion was not entirely consistent with other substantial evidence in the record, but he didn't cite any records or explain any perceived inconsistency with the other evidence. The ALJ said that Dr. Golubic's opinion was somewhat vague – but didn't explain how it was vague. He said that Dr. Golubic had only a short treating relationship with Durr but

didn't say how long he treated Durr or why, on that basis, Dr. Golubic's opinion was entitled to less weight than opinions of medical sources who saw Durr once or only reviewed a portion of her records. He assigned *great* weight to the consulting examiner's opinions who saw Durr once – far less than the nine times[6] Durr saw Dr. Golubic. (Tr. 18). And the ALJ assigned great weight to the state reviewing physicians, who never saw Durr at all and who did not see all of Durr's records. (Tr. 18). The ALJ said that Dr. Golubic's opinion was related to Durr's ability to work, an issue reserved to the Commissioner. However, unlike some treating sources, Dr. Golubic did not directly opine that Durr was unable to work or that she was disabled. Rather he opined that Durr may miss work and be off-task.

The Commissioner argues that the ALJ properly explained his decision. The Commissioner cites portions of the record that arguably supported the ALJ's decision. The problem is that the ALJ never mentioned these records in describing his evaluation of Dr. Golubic's opinion. And, the Commissioner's post-hoc rationalizations do not cure the ALJ's failure to provide good reasons for not assigning controlling weight to Dr. Golubic's opinions. *Steckroth v. Comm'r of Soc. Sec.,* 2012 U.S. Dist. LEXIS 44895, E.D. Mich. March 30, 2012, quoting *Hyatt Corp v. NLRB,* 939 F.2d 361, 367 (6th Cir. 1991) ("Courts are not at liberty to speculate on the basis of an administrative agency's order. . . . [nor is the court] free to accept 'appellate counsel's rationalization for agency action in lieu of reasons and findings enunciated by the Board.'") (citations omitted).

The ALJ did not provide specific support for his decision to assign less than controlling weight to Dr. Golubic. Good reasons may have existed for his decision, but the ALJ did not build a logical bridge between the evidence and the weight assigned to the treating source's

---

[6] ECF Doc. 12 at 5.

opinion.  In such cases, the court remands for a better explanation.  *Gayheart*, 710 F.3d at 376;
*see also Cole*, 661 F.3d at 939.

### 2.    Dr. Buckner

Durr also argues that the ALJ erred in assigning little weight to the forms completed by
Dr. Buckner and her nurse case manager.  ECF Doc. 12 at 17.  Durr acknowledges that Dr.
Buckner opined that Durr *would* be able to return to work in January 2015.  However, Durr
argues that her peripheral neuropathy did not improve as expected.  ECF Doc. 12 at 17.  Durr has
not fully developed her argument related to the opinion of Dr. Buckner.  She doesn't explain how
assigning more weight to this opinion might have impacted the ALJ's RFC determination.  And
Durr has not explained how, if at all, Dr. Buckner's opinion changed after Durr's peripheral
neuropathy did not improve.

Regarding the form completed by Dr. Buckner and his nurse case manager, the ALJ
stated:

> The undersigned gives little weight to the opinion of Kristin A., NCM, a nurse
> case manager, and Kelli Buckner, DO., (Ex. 1F, p. 6-7, 15-18).  On November
> 21, 2014, Dr. Buckner completed a form for the claimant's Family and Medical
> Leave Act application.  She opined that the claimant was unable to perform her
> job duties due to her uncontrolled diabetes and neuropathic pain.  While Ms. A. is
> not an acceptable medical source as that term is defined by the Regulations, the
> undersigned is required to evaluate her opinion to the extent it is supported by the
> evidence of record as taken as a whole.  (20 CFR 404.1513(a)).  In December
> 2014, Ms. A. completed a short term disability form for the claimant, in which she
> stated that the claimant should be excused from work for three months to
> complete a strict nutritional program.  In addition to occurring prior to the
> claimant's alleged onset date of disability, these opinions concern the claimant's
> ability to work, which is an issue reserved to the Commissioner.  (20 CFR
> 404.1527(d)).  Therefore, these opinions are given little weight.

(Tr. 19-20).

Dr. Buckner and Ms. A. completed forms to estimate how much time Durr would require
off work for the purpose of short-term disability insurance.  At the time the forms were

competed, Dr. Buckner thought that Durr would be able to return to work in three to six months. The form provides little information regarding Dr. Buckner's long-term opinion of Durr's functional limitations. As pointed out by the ALJ, the opinions expressed in these forms were based on office visits with Durr before her alleged disability began. (Tr. 320). Thus, even though Dr. Buckner was a treating physician, her opinion only related to a period of time before Durr's alleged disability began. The ALJ adequately explained why non-controlling weight was assigned to Dr. Buckner's treating source opinion.

### C.    Impairments in Combination with other Impairments

Durr argues that the ALJ failed to consider all of her impairments in conjunction with one another. Specifically, she argues that he failed to properly consider Social Security Ruling 02-1p (obesity), Social Security Ruling 14-2p (diabetes) and the effects of her psychological impairments on her ability to engage in skilled or semi-skilled substantial gainful activity on a sustained basis.

### 1.    Obesity

First, Durr argues that the ALJ failed to consider the effects of her obesity and how her obesity and sleep problems combined to make her peripheral neuropathy worse. Social Security Ruling 12-1p provides in relevant part:

> 2. How Does Obesity Affect Physical and Mental Health?
>
> Obesity is a risk factor that increases an individual's chances of developing impairments in most body systems. It commonly leads to, and often complicates, chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems. Obesity increases the risk of developing impairments such as type II (so-called adult onset) diabetes mellitus-even in children; gall bladder disease; hypertension; heart disease; peripheral vascular disease; dyslipidemia (abnormal levels of fatty substances in the blood); stroke; osteoarthritis; and sleep apnea. It is associated with endometrial, breast, prostate, and colon cancers, and other physical impairments. Obesity may also cause or contribute to

mental impairments such as depression.  The effects of obesity may be
subtle, such as the loss of mental clarity and slowed reactions that may
result from obesity-related sleep apnea.

The fact that obesity is a risk factor for other impairments does not mean
that individuals with obesity necessarily have any of these impairments.
It means that they are at greater than average risk for developing the
other impairments.

SSR 12-1p, 2002 SSR LEXIS 1 *.  SSR 12-1p provides that the Commissioner will consider

obesity throughout the sequential evaluation including at Step Four when determining whether

obesity prevents the claimant from doing past relevant work.

Here, the ALJ found that Durr's obesity was a severe impairment.  (Tr. 12).  He

considered the impact that Durr's "obesity had alone and in combination with other impairments,

on limitation of function including [Durr's] ability to perform routine movement and necessary

physical activity within the work environment."  (Tr. 14).  Durr does not cite any authority that

would require the ALJ to provide a more detailed explanation of how he considered obesity in

making his decision.  Nor is there any reason to question the ALJ's statement that he considered

Durr's obesity.  Durr argues that the ALJ did not consider how obesity impacted her sleep

problems, but she does not cite any evidence in the record indicating that her obesity was

affecting her ability to sleep adequately.  She cites a record stating that she left her job due to her

lack of sleep, but this record merely supports the argument that she was having difficulty getting

enough sleep.  It does not link the sleep issue to obesity.  (Tr. 218).  Durr does not explain how

her obesity had any impact on her sleep (ECF Doc. 12 at 15), evidently believing the court can

make the commonsense conclusion that obese people may have trouble getting enough sleep.[7]

This is not the role of the reviewing court.  Durr has not adequately developed her argument that

---

[7] Durr *does* cite records showing that the pain in her feet from diabetic neuropathy impacted her sleep.
ECF 12 at 15.

the ALJ inadequately considered her obesity in combination with her other impairments. Her argument that the ALJ failed to properly consider her obesity is not well taken.

### 2. Depression

Durr also argues that the ALJ improperly found that her depression caused only minimal limitations in Durr's ability to perform basic mental work activities and was non-severe. ECF Doc. 12 at 15-16. She contends that the ALJ improperly relied on the consultative examination rather than the opinions of her treating physicians from the Cleveland Clinic. ECF Doc. 12 at 16. Durr doesn't cite any specific opinion evidence in support of this argument. And the court notes that there was little evidence that Durr's depression was having a significant impact on her functional abilities. Nor is it clear that there is any evidence supporting Durr's argument that her depression, in combination with her other impairments, should have been evaluated differently.

Having said all that, the ALJ did not properly build a logical bridge between the evidence and the weight he assigned to Dr. Golubic's opinion. To the extent that Dr. Golubic indicated that depression impacted Durr's physical condition (Tr. 583), upon remand the ALJ should consider Durr's depression in reevaluating the opinion evidence. It may be that Dr. Golubic's opinion regarding Durr's depression is not supported by the record evidence. But, if that is the case, the ALJ must specifically explain so in a way that permits the claimant and subsequent reviewers to understand his decision.

### 3. Diabetes

Next, Durr argues that the ALJ failed to consider the effects of her diabetes in light of Social Security Ruling 14-2p, 2014 SSR LEXIS 4. Specifically, Durr contends that SSR 14-2 acknowledges a relationship between type 2 diabetes and obesity and also discusses neuropathy. The ALJ found that Durr's diabetes was a severe impairment. (Tr. 12). However, the ALJ noted

that Durr had attempted to manage her diabetes through diet and exercise. She had refused medication for this condition and the ALJ's overall discussion on this impairment shows that there was little evidence that Durr's diabetes was impacting her ability to function in the workplace. (Tr. 16). Durr argues that the ALJ discussion of her diabetes "compounded the error of finding that Durr's depression was a non-severe impairment…" ECF Doc. 12 at 16. Durr does not fully develop this argument and it is unclear how the ALJ's analysis of her diabetes impacted his depression analysis. There was little evidence in the record that Durr's diabetes or depression had an impact on her ability to work. Indeed, Durr has not cited any evidence supporting this correlation. She cites testing showing mild to moderate sensory motor peripheral polyneuropathy of her lower extremities, (Id.) but she doesn't cite records showing how her obesity and diabetes, in conjunction with one another, negatively impacted her functional abilities.[8]

The Social Security Rulings provide that there may be a correlation between some impairments such as obesity, diabetes and neuropathy. However, in this case there is little evidence that Durr's conditions, alone or in conjunction with one another, were causing greater functional limitations than the ALJ found to exist. The ALJ stated that he considered Durr's impairments in conjunction with one another, and Durr does not cite any authority requiring the ALJ provide a more complete explanation on this issue. Because the court is remanding this case for further consideration of Dr. Golubic's opinion, the ALJ's evaluation of some of Durr's impairments, such as depression, may be revisited. Otherwise, Durr hasn't shown any error in the ALJ's evaluation of how impairments combined to impact her ability to function.

---

[8] The court notes that this absence of record evidence may have been a basis upon which the ALJ could have discounted the opinion evidence of the treating source, Dr. Golubic. But, as discussed above, it is not the function of this court to supply reasons not articulated by the ALJ.

### D.    Durr's Symptoms/Credibility

Durr argues that the ALJ failed to properly assess her credibility.  ECF Doc. 12 at 21.  By regulation, the ALJ must consider all objective medical evidence in the record, including medical signs and laboratory findings, when such evidence is produced by acceptable medical sources.  See 20 C.F.R. § 404.1513.  The agency states it will "consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  20 C.F.R. § 404.1529(a).  Further, the agency states that it "will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."  20 C.F.R. §404.1529(c)(2).  The agency must follow and apply its own procedural regulations, and failure to do so warrants remand.  *Minor v. Comm'r of Soc. Sec.* 513 F. App'x 417, 434 (6th Cir. 2013).

It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability.  *See Kirk v. Sec' of Health and Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981), cert. denied, 461 U.S. 957, 103 S. Ct. 2428, 77 L. Ed. 2d 1315 (1983).  However, when a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  *See e.g, Massey v. Comm'r of Soc. Sec*., 409 F. App'x 917, 2011 WL 383254 at * 3 (6th Cir. 2011).  First, the ALJ must determine whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms.  Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work."  20 C.F.R. § 404.1529(c)(1).  See also SSR 16-3p,

2016 SSR LEXIS 4 (March 16, 2016).  Essentially, the same test applies when the alleged symptom is pain, as the Commissioner must; (1) examine whether the objective medical evidence supports a finding of an underlying medical condition; and, if so, (2) whether the objective medical evidence confirms the alleged severity of pain arising from the condition or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.  *Duncan v. Secretary of Health & Human Services*, 801 F.2d 847, 853 (6th Cir. 1986).  *See also Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994); *Pasco v. Comm'r of Soc. Sec.*, 137 F. App'x 828, 834 (6th Cir. June 2005).

If these claims are not substantiated by the medical record, the ALJ must evaluate the claimant's statements about the intensity, persistence and limiting effects of the individual's symptoms based on the entire case record.  See SSR 16-3p, 2016 SSR LEXIS 4. [9] Determinations regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) ("noting that "credibility determinations regarding subjective complaints rest with the ALJ.")  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided

---

[9] SSR 16-3p, 2016 SSR LEXIS 4 has removed the term "credibility" from the analysis.  Rather, SSR 16-3p, 2016 SSR LEXIS 4 directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms," and "evaluate whether the statements are consistent with objective medical evidence and other evidence."  SSR 16-3p, 2016 SSR LEXIS 4.  The Sixth Circuit has characterized SSR 16-3p, 2016 SSR LEXIS 4 as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016).

by medical sources, and any other relevant evidence on the record.  See 20 C.F.R. §404.1529; SSR 16-3p, 2016 SSR LEXIS 4, Purpose, 2016 SSR LEXIS 4 (March 16, 2016).  Beyond medical evidence, there are seven factors that the ALJ should consider.[10]  The ALJ need not analyze all seven factors but should show that he considered the relevant evidence.  *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp.2d. 724, 733 (N.D. Ohio 2005); *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ properly considered the relevant evidence in the way the Social Security Regulations require.  He found that Durr's medically determinable impairments could reasonably be expected to cause her alleged symptoms.  But he also found that her statements regarding the intensity, persistence and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record.  (Tr. 15).  The ALJ seemingly considered the factors from 20 C.F.R. § 404.1529(c)(3) and specifically mentioned some of them in his decision.  He noted that, despite her refusal to treat her impairments with prescribed medication, Durr stated she had been able to manage her symptoms with physical therapy, acupuncture, dietary changes, a home exercise program and meditation.  (Tr. 15).  He also considered her activities of daily living.  He stated that the record showed that Durr shopped, drove, read, prepared meals, babysat and lifted her grandson, spent time with family and friends, managed her funds, used the internet, took care of her four cats, handled her self-care needs, did yoga, squats, Zumba, lifted weights and went on walks.  (Tr. 13, 17).

Durr contends that the ALJ erred in his symptom evaluation by "failing to address any of her psychological symptoms or concentration problems."  ECF Doc. 12 at 22.  However, the ALJ

---

[10] These include the claimant's daily activities; the location, duration, frequency, and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication; and treatment or measures, other than medication, taken to relieve pain.  20 C.F.R. § 404.1529(c)(3).

recognized that Durr testified that she could not work because of problems sleeping at night, constant pain, and problems focusing and thinking. (Tr. 15). Despite these problems, she did not seek any mental health counseling and was unwilling to take medication. (Tr. 18). The state agency reviewing psychological examiners found that Durr had only mild mental impairments. Similarly, the consultative psychological examiner found that Durr's description of her depressive symptoms did not appear to be clinically significant. (Tr. 18). Thus, the ALJ considered Durr's testimony of her psychological symptoms along with the medical opinions and record evidence and found that her testimony was not entirely consistent with the other evidence. (Tr. 15). The ALJ followed the regulations and properly considered Durr's symptoms and the extent to which they were reasonably consistent with the objective medical evidence. The ALJ did not err in this part of his analysis.

### E. Past Job

Finally, Durr argues that the ALJ improperly found that she could return to her past jobs as a customer service representative and as a telephone sales representative. ECF Doc. 12 at 23. Both of these jobs were performed at the sedentary level of exertion and were either skilled or semi-skilled. (Tr. 58). The ALJ relied on the VE's opinion that someone with Durr's RFC could perform her past jobs. (Tr. 59). Durr contends that the ALJ should have found that she was limited to simple tasks and routine and repetitive tasks. Such a finding may have changed the outcome because the VE testified that a person with those limitations would *not* be able to perform Durr's past jobs. (Tr. 61-62). But Durr cites no medical opinions or treatment notes in support of this argument. Rather, she argues that these limitations should have been incorporated into her RFC because of her depression and inability to focus due to pain caused by her peripheral neuropathy. ECF Doc. 12 at 24. In other words, she argues that the ALJ was required

to incorporate these limitations into her RFC based on her characterization of her symptoms and how they impacted her ability to function.

As discussed above, the court finds no error in the ALJ's assessment of Durr's symptoms. He was not required to accept her statements about the intensity of her symptoms and he properly compared them with the objective medical evidence. He found that her statements regarding the intensity, persistence and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 15). He supported this finding with evidence from the record. He properly evaluated her symptoms and was not required to incorporate limitations supported only by her complaints into his hypothetical questions to the VE or into his RFC finding. *See Stanley v. Sec'y of HHS,* 39 F.3d 115, 118 (6th Cir. 1994).

## VI.    Conclusion

The ALJ properly evaluated Dr. Buckner's opinions, the combined effects of Durr's impairments, and her statements about her symptoms. However, the ALJ did not adequately explain the weight he assigned to the opinion of treating physician, Dr. Mladen Golubic, in violation of agency regulations. An evaluation of Dr. Golubic's opinion in accordance with proper legal standards may impact the ALJ's decision at other steps in the sequential analysis, including his RFC determination. Because the ALJ failed to apply proper legal standards in evaluating Dr. Golubic's opinion, the Commissioner's final decision denying Durr's application for DIB is VACATED and Durr's case is REMANDED for further consideration consistent with this Memorandum of Opinion and Order.

IT IS SO ORDERED.

Dated: October 11, 2019

Thomas M. Parker
United States Magistrate Judge